## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

CHASITY HUTCHINSON,

          Plaintiff,

v.                                                  CIVIL  ACTION  NO.  3:07-0424

THE WEST VIRGINIA STATE POLICE, et al.,

          Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before this Court is Defendants' motion for summary judgment (Doc. 168).  For the reasons stated below, the Court **GRANTS in part** and **DENIES in part** the motion.

### General Background

This case arises out of the search of a home, on July 8, 2005, and into the early hours of July 9, 2005.   Although some material facts remain at issue, the following general description of the search is undisputed.

On July 8, 2005, between 11 and approximately 11:40 p.m., a West Virginia State Police Special Response Team ("SRT") executed a warrant to search Plaintiff's residence.  The SRT consisted of eight officers: First Sgt. R.D. Stonestreet (the team leader), Trooper Travis Berry, First Sgt. C.J. White, Sgt. J.L. Phillips, Cpl. R.D. Arthur, TFC. Todd Berry, Sr. Trooper T.J. Mikell, and Trooper M.L. Ogelsby.  The team was accompanied by  a K-9 Officer, J.M. Pack.  The SRT was assembled because the police anticipated the search may have involved officer exposure to the dangers associated with individuals with violent histories, the manufacture of methamphetamine,

and firearms.[1]

On July 8, 2005, the SRT entered Plaintiff's home pursuant to a valid warrant.  As a team, the officers cleared the residence for dangers; secured the occupants (four); and searched the premises for items consistent with the manufacture of methamphetamine and for firearms.  The K-9 Officer, J.M. Pack, never entered the home and, as a result, has been dismissed from this action.  The four occupants of the residence were: Plaintiff Chastity Hutchinson, Josh Hutchinson (Plaintiff's brother), Mike Allen (Plaintiff's stepfather), and Edward Glenn (Plaintiff's then-fiancé).  Josh Hutchinson was in the kitchen, allegedly snorting a pain pill prescribed for injuries related to a recent car accident.  Mike Allen had recently returned from work and was in the living room, near the steps.  Edward Glenn was moving toward the living room from an upstairs bedroom.  Chastity Hutchinson was in the shower.

Immediately following entry, Josh Hutchinson was secured in the kitchen and laid face-down on the floor, unhandcuffed.  He was then monitored by two officers (Oglesby and White), who remained in or near the kitchen with him, until he was transported to a local hospital, by ambulance, at approximately 12:25 a.m.  Mike Allen and Edward Glenn were secured soon after entry.  They were detained in the living room, where they were laid face-down.  Mike Allen was handcuffed and, it appears, Edward Glenn was left unhandcuffed.  Chastity Hutchinson was found, showering, in the home's only bathroom.  She was taken into custody and forcibly escorted to the living room, where she was laid face-down, unhandcuffed, alongside Mike Allen and Edward Glenn.  While Josh

---

[1]An SRT is used to conduct a search when weapons are present, or there is a possibility of weapons; when the past history of the residence or occupants involves violence; or when other hazards may be involved in a search. Such dangers warrant deploying officers with specialized training and experience. *See Stonestreet Depo.* (Doc. 168-5), at 17-20.

2

Hutchinson, Mike Allen, Edward Glenn, and Chastity Hutchinson were taken into custody and first detained, the SRT conducted an initial sweep to clear the residence.  A secondary, more thorough, sweep was then conducted.  No additional occupants were found.

The exact timing of the SRT's entry into the residence and the subsequent search and detentions is disputed.[2]  However, it is undisputed that: (1) an ambulance left the residence to transport Josh Hutchinson to St. Mary's Hospital at 12:25 a.m., and (2) the relevant events transpired over about an hour.

### Plaintiff's Complaint and Defendants' Motion

Chastity Hutchinson's claims pertain to the SRT's conduct, and the conditions of her detention, during the time between entry and when Josh Hutchinson was transported to the hospital at approximately 12:30 a.m.  Ms. Hutchinson claims that she was unlawfully detained during this time and that she was subjected to excessive and unlawful force in the course of her detention. Specifically, Ms. Hutchinson brings six causes of action against Col. David Lemmon, Superintendent of the West Virginia State Police, in his official and individual capacity, and West Virginia State Police Officers First Sgt. R.D. Stonestreet, Trooper Travis Berry, First Sgt. C.J. White, Sgt. J.L. Phillips, Cpl. R.D. Arthur, TFC. Todd Berry, Sr. Trooper T.J. Mikell, and Trooper M.L. Ogelsby, in their official and individual capacities.  Ms. Hutchinson demands judgment against the defendants, jointly and severally, on counts of: (1) assault and battery; (2) illegal seizure of her person in violation of the U.S. and West Virginia Constitutions; (3) excessive force (which Plaintiff characterizes as a claim for the deprivation of her "right to freedom from physical abuse,

---

[2]The parties dispute whether the SRT entered the home at approximately 11 p.m. or approximately 11:40 p.m.

3

coercion and intimidation"); (4) unreasonable invasion of her right to privacy (a tortious claim based on the alleged intrusion of Plaintiff's seclusion); (5) the tort of outrage (also referred to as intentional infliction of emotional distress); and (6) failure to train employees in violation of 42 U.S.C. § 1983 (against Defendant Lemmon and the W.V. State Police).  Plaintiff seeks damages for pain, suffering, and mental anguish.  She also seeks punitive damages, as well as attorneys' fees, expenses and costs pursuant to 42 U.S.C. § 1988.

Defendants have moved for summary judgment on all claims.  Defendants contend Ms. Hutchinson has failed to establish a genuine issue of material fact with regard to each of her allegations.  Additionally, they claim qualified immunity.  The two primary issues at the heart of Defendants' motion are: (1) the length of time Chastity Hutchinson was forced to remain unclothed and/or uncovered following her removal from the shower; and (2) whether SRT members subjected Ms. Hutchinson to excessive force and/or unlawful battery in the course of her detention.  Also at issue is whether Plaintiff can establish a triable question with regard to the adequacy of the officers' training.

**Standard of Review**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Fed. R. Civ. P. 56(c)*.   "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in

4

original).  In other words, the availability of summary judgment turns on whether a proper jury question exists in a pending case.  *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970).

In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]"  *Anderson*, 477 U.S. at 249.  Rather, the Court draws any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec.Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  Still, to withstand summary judgment, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Thus, if the nonmoving party has the burden of proof on an essential element of his or her case and does not, after adequate time for discovery, make an evidentiary showing sufficient to establish that element, then summary judgment will be granted.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### Detailed Factual Background

Taken in the light most favorable to Plaintiff, the facts are as follows.  TFC. Todd Berry came upon a locked bathroom door during the initial sweep of the home.  *Todd Berry Depo.* (Doc. 173-18), at 60.  He was immediately joined by another officer, whom he believes to be Cpl. Arthur, and together they breached the bathroom door.  *Id.* at 60-63.  The officers found Chastity Hutchinson stepping out of the shower.  TFC. Berry then "moved up [into the bathroom] ... to make sure no one else was in that shower or if she was a decoy for somebody standing there," and "[t]he

team member that was behind [TFC. Berry took Chastity Hutchinson] out of the bathroom." *Todd Berry Depo.* (Doc. 173-18), at 61-62; *see also id.* at 65 ("[H]e was right behind me and took custody of her."). At that point, TFC. Berry "cleared the toilet ... exited the bathroom and went right to the first bedroom that would have been on [his] right." *Id.* at 62.

The officer who took custody of Chastity Hutchinson grabbed her by the hair and pushed her down toward the ground, before forcibly escorting her to the living room. Despite attempts to reach for a towel, Ms. Hutchinson was not allowed to cover herself while in the bathroom, or during her removal. At two different points in her deposition, Ms. Hutchinson describes the scene.[3]

> [T]he next thing I know, there's two guys kicked open my bathroom door and had me at gun point, screaming. ... "Get down, bitch, now." ... "Get down." I wrapped one arm around my breasts and one on my groin and hit my knee trying to cover myself. They kept screaming for me to get down. Kept screaming, "Get down bitch now. Get down." I was on my knees. I reach behind me, because there was a towel rack, it was like a bookshelf, that's where we kept the towels and wash rags. I reach behind me to get a towel, but before I had a chance to, the next thing I knew they grabbed me by the hair of the head, slammed my head down and proceeded to drag me into the living room. *C. Hutchinson Depo.* (Doc. 173-23), at 90.
>
> *************
>
> I automatically covered myself and hit my knees. ... I dropped to my knees[.] ... They kept screaming. I kept asking what was going on. And I reach like behind me to get a towel and that's when they grabbed me by the hair and drug me into the living room. ... There were two officers there, one had me by the hair. ... He had me by the hair of the head about right here (indicating) and kind of like slammed my head down for me to get down when he grabbed me by the hair. And whenever he drug me, I was still like hunkered over trying to cover myself as he pulled me into the living room. ... I was walking. I was on my feet. I was just hunkered over, you know. *Id.* at 134-35.

**Q:      Were you walking?**

---

[3]Although slight, the variations in Ms. Hutchinson's descriptions are significant. In particular, it is important to note that: (1) in her later testimony Ms. Hutchinson explains that, instead of "slamming [her] head down" into the ground, the officer who initially detained her "kind of shoved [her] head like for [her] to get further down;" and (2) Ms. Hutchinson explains that, instead of being pulled off her feet and "drug" into the living room, she was on her feet walking (albeit guided forcefully by her hair). This is discussed in more detail *infra.*

6

A:      Yes, I was walking.  I was on my feet.  I was just hunkered over, you know.

**Q:      So you were kind of hunkered over trying to cover your privates up?**

A:      Yes.

**Q:      And he's got you by the hair kind of on top of your head?**

A:      Yes.

**Q:      And he's pulling you along?**

A:      Yes.

**Q:      And you're walking –**

A:      Very fast.

**Q:      – very fast kind of as he pulls you.  Fair?**

A:      Yes.

**Q:      This isn't the situation where you're on the ground and he's actually dragging you by your hair, right?**

A:      No.

**Q:      He's kind of using your hair to guide you?**

A:      Right.

**Q:      Did he pull any of your hair out?**

A:      No.

**Q:      When you say he slammed your head into the ground –**

A:      No, not into the ground, he just kind of, whenever he grabbed me, he was screaming get down.  When he grabbed me, he kind of shoved my head like for me to get

7

further down.[4]  *C. Hutchinson Depo.* (Doc. 168-1), at 135-37.

Once in the living room, Ms. Hutchinson was laid face-down, alongside Mike Allen and Edward Glenn.  She was naked and unhandcuffed, in the presence and view of eleven men (the eight SRT officers, her brother, her stepfather and her then-fiancé).  Despite repeated requests for clothing or other covering, she was forced to remain this way for 30 to 45 minutes.  *See Glenn Depo.* (Doc. 173-21), at 27-29, 31-32 (testifying that Chastity Hutchinson repeatedly asked to be covered, yet remained naked "for a long time," or "around about 30 minutes"); *Allen Depo.* (Doc. 173-16), at 25-28, 44 (testifying that Chastity Hutchinson repeatedly asked for clothing, yet was forced to remain naked for 30 to 45 minutes); *C. Hutchinson Depo.* (Doc. 173-23), at 90-94, 121-22, 124-26, 135 (testifying that she was repeatedly denied clothing and left exposed for "approximately 30 minutes").  Ms. Hutchinson was eventually provided a towel or blanket to cover herself, before being given clothing at some later point.  *Glenn Depo.* (Doc. 173-21), at 27-29, 31-32; *Allen Depo.* (Doc. 173-16), at 26-28; *C. Hutchinson Depo.* (Doc. 173-23), at 92-94, 121-22, 124-26.  Once allowed, Ms. Hutchinson was required to dress in front of a police officer.[5]  *C.*

---

[4]One other person,  Cpl. Arthur, testified to the facts surrounding Ms. Hutchinson's discovery and initial detention.  Cpl. Arthur's account of those events differs in key ways from TFC. Berry's and Ms. Hutchinson's recollections.  First, Cpl. Arthur testified that he arrived at the bathroom *after* TFC. Berry.  Further, he states that, upon his arrival, TFC. Berry had breached the door and was in the process of  "giving verbal commands to a female."  *Arthur Depo.* (Doc. 173-17) at 36-37.  Cpl. Arthur also testified that Ms. Hutchinson was covered at the time, *id.* at 37 ("She was attired with a – it was either a blanket or a towel or something."), and that, after he encountered Ms. Hutchinson and TFC. Berry in the bathroom, he "kept flowing through the house[,]" *id.* at 39, "going through the house[,]" *id.*, and clearing it for dangers.

[5]SRT member testimony is, generally, consistent and disputes the version of events provided by Mike Allen, Edward Glenn and Chastity Hutchinson.  Cpl. Arthur testified that Ms. Hutchinson was covered when he arrived at the bathroom, which occurred within minutes of entry.  *Arthur Depo.* (Doc. 173-17), at 37.  Trooper Ogelsby, one of the officers stationed in the kitchen to monitor Josh Hutchinson, testified that Ms. Hutchinson was covered when he looked into the living room, approximately two to five minutes after the SRT's entry into the home.

*Hutchinson Depo.* (Doc. 173-23), at 94.

During the time between when her removal to the living room and when Chastity Hutchinson was provided covering, she was touched on her naked behind by one of the SRT members. As noted *supra,* Ms. Hutchinson repeatedly and stridently asked for clothing, or for some other covering, while she was detained. Police testimony confirms that she was "pretty verbal." Officer testimony, however, is, generally, that she screamed "because of her brother, who was in the kitchen, Josh. ... She was explaining that he had been in the wreck and was legitimately hurt." *Stonestreet Depo.* (Doc. 168-5), at 61; *see also Oglesby Depo.* (Doc. 168-6), at 93-94 ("[S]he was red in the face and she was screaming at us obscenities, comments. She called us names but I can't remember exactly what she said. ... But basically she said something about her brother and his hurt back."); *but see id.* at 110-11 ("I remember her asking for clothes. ... [S]he complained about being naked, I guess."). In response to her complaints, one of the SRT officers slapped or patted Ms. Hutchinson on her naked behind. She explains:

> They drug me into the living room and threw me down in front of everybody. At that point, I seen my fiancé at the time and my dad and my brother, also, lying on the floor. ... So they threw me down in front of them. At this point, asking what's going on and could I cover myself? Just repeatedly they kept saying, "Shut up, bitch. Keep your head down and mouth shut." They just keep screaming at me. And I was like, "Can I at least cover myself?" One officer, I don't know who or where he was, it was coming from behind me, made the statement, "What's the matter? Don't you think we've seen a bitch's ass before." And I just looked at them. Every time I would lift my head, the one that was behind me would take his foot and shove it back down and the repeatedly said ... "Shut up bitch. Keep your head down and mouth shut." *C. Hutchinson Depo.* (Doc. 173-23), at 92-93.

*************

---

*Oglesby Depo.* (Doc. 168-6), at 93, 169. Trooper Travis Berry testified that he saw Chastity Hutchinson lying covered with "a towel or blanket or something on her" within approximately two minutes of entry. *Travis Berry Depo.* (Doc. 168-7), at 131-32. Finally, First Sgt. Stonestreet testified that he saw Plaintiff covered or clothed within three to five minutes of entry. *Stonestreet Depo.* (Doc. 168-5), at 61, 81-82.

I asked for a warrant. That's when they told me they had one, that's all I needed to know. I am still screaming, asking what is going on. Can I at least get something to cover up with? One officer makes the statement, "What's the matter? Don't you think we've seen a bitch's ass before." Then whenever – that goes on for a few minutes. Whenever they stepped on Josh, I screamed. One officer from behind me, I don't know, he was on my left-hand side behind me, had bent down and patted me on my butt and said, "Calm down, sweetie. Oh, I guess I shouldn't have touched you there, huh." And that's when – after that is whenever they said, another officer stated, can we get her – or can we find something to cover her, something along those lines, get me something to cover up. And that's when he threw me a blanket.

**Q:      So one officer patted you on the butt and said, "Calm down, sweetie?"**

A:      "Calm down, sweetie."

**Q:      And then said something like, "Oh, I shouldn't have touched you there?" ... Something to that effect? Did he seem to be sincere when he said, "I shouldn't have touched you there?"**

A:      To me, it seemed like a chuckle, a smirk.

*C. Hutchinson Depo.* (Doc. 173-23), at 122-23.

Mike Allen's testimony is consistent with this recollection.

**Q:      Okay. Tell me what you recall about the police coming into the house and their stay there.**

A:      Bust through the door, I think they was screaming to get down. They grabbed me. And Edward was – he was somewhere close by me because they grabbed him, too, throwed us on the floor, stood on our backs, put AK47s at our head. Throwed Josh in the floor, stepped on his back. Drug Chastity out of the shower, drug her in there and throwed her right beside me in the living room floor, naked. Then there was just a bunch of commotion going on for a while.

\* \* \* \* \* \* \* \* \* \* \* \* \*

**Q:      Okay. And when she was face down on your right side, when she was brought in, she didn't have on any clothes. Correct?**

A      Correct.

**Q:      And then at some point she was covered up.**

10

*************

A:      About a half hour, 45 minutes later, because she was screaming to get a cover or a towel or something, and they wouldn't put it on her.

**Q:      What makes you think it was a half an hour or 45 minutes later?**

A:       Because it was a very long time, there was a lot of commotion.  And I remember, quote, when that officer – I don't know, because they had the full, you know, the mask and the guns and the house is full of them.  But I remember when he slapped her on the butt, he said, quote, "You think you're the first bitch's ass we've ever seen before?"  And I tried to come up out of there, and that's when they pushed me down on the floor.

**Q:      And at what point did this –**

A:      Quote, unquote.  That's exactly what he said.  I remember that well.

**Q:      At what point did this quote that you just talked about occur?**

A:      It was before she got covered up.[6]

*Allen Depo.* (Doc. 173-16), at 25-27.

In sum, there is a dispute of fact with regard to: (1) the time the SRT entered Plaintiff's residence on the night of July 8, 2005; (2) the length of time Ms. Hutchinson was required to remain naked; and (3) whether she was slapped or patted on her bare behind.  However, construing the facts in the light most favorable to Plaintiff, the Court **FINDS** as follows.  Two police officers discovered Plaintiff naked, in the shower, during the search of her home on July 8, 2005.  One of the officers forcibly escorted Plaintiff, naked, by her hair, to the living room.  She was handled roughly in the process; forcibly required to kneel or lay, with her head forced toward the ground when she raised it to shout or otherwise.  Despite repeated pleas for clothing or other covering,

---

[6]Based on the excerpts provided to the Court, it appears that none of the police officers deposed discuss this event – i.e, whether one of the SRT officers touched Ms. Hutchinson's naked behind, while she was detained.

11

Plaintiff was forced to remain naked and exposed, in the presence of eleven men, for approximately 30 to 45 minutes.  During that time, the officers conducted primary and secondary sweeps of the residence.  Additionally, during that time, at least one officer made demeaning comments to Plaintiff and another officer (or possibly the same officer) touched her naked behind, in a manner found offensive and derogatory to Plaintiff and to at least one other occupant.

## Analysis

The pertinent inquiry to resolving this motion is whether Plaintiff has established a genuine issue of material fact with regard to any of her claims.  The simple answer is yes.  Plaintiff has established a triable issue with regard to certain claims.  The motion is, therefore, reviewed on a claim-by-claim basis.

However, before the Court considers the merits of Defendants' motion, it must address Defendants' contention that Plaintiff's claims against the West Virginia State Police and those claims brought against the officers in their official capacities fail as a matter of law.  Defendants seek to dismiss these claims as claims against the State of West Virginia, which are barred by the Eleventh Amendment.  In her response, Plaintiff notes that all Defendants are sued in their individual and official capacities and appears to concede that those claims raised against the West Virginia State Police and brought against the SRT members, in their official capacities, should be dismissed.  The Court agrees with this apparent concession.  *See, e.g.,* U.S. Const. amend. XI; *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[S]tate officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself.") (internal citations omitted); *Kentucky v. Graham*, 473 U.S. 159, 165-66 (same).

12

Accordingly, Plaintiff's official capacity claims are **DISMISSED** and the remainder of this decision resolves Defendants' motion only insofar as Plaintiff's complaint raises claims against Defendants in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("We hold that state officials, sued in their individual capacities are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits[.]").

Next, before continuing to the merits, the Court must consider the effect of Article VI § 35 of the Constitution of West Virginia on this lawsuit. Article VI § 35 provides, in pertinent part, that: "The state of West Virginia shall never be made defendant in any court of law or equity." W.V. Const. Art. VI § 35. In *Pittsburgh Elevator Co. v. West Virginia Board of Regents,* 310 S.E.2d 675 (W. Va. 1983), however, the West Virginia Supreme Court of Appeals held: "Suits which seek no recovery from state funds, but rather allege that recovery is sought under and up to the limits of the State's insurance coverage, fall outside [this] traditional constitutional bar to suits against the State." *Id.* at Syl. Pt. 2. In *Parkulo v. West Virginia Board of Probation and Parole*, 483 S.E.2d 507 (W. Va. 1997), the Court then developed a pleading rule relevant to this exception. It held that, "[i]n the future, this Court will not review [such] suits ... unless it is alleged that the recovery sought is limited to the applicable insurance coverage and the scope of the coverage and its exceptions are apparent from the record." *Id.* at Syl. Pt. 3. Defendants argue that Plaintiff's state-law claims should be dismissed, pursuant to *Parkulo*, because her complaint does not expressly state that she seeks monetary recovery only to the extent available under the applicable State insurance policies. This Court disagrees. Instead, it agrees with the U.S. District Court for the Northern District of West Virginia, which found in *Rosenthal v. Jezioro*, 2008 WL 4900563 (N.D. W.Va. Nov. 13, 2008), that the pleading requirement established in *Parkulo* is mandatory

only in the state courts and does not affect a suit under 42 U.S.C. § 1983 against state officials in their individual capacities. *Id.* at *4. Accordingly, this Court finds that *Parkulo* does not create a hurdle to resolving Plaintiff's claims.

I. *Defendants are not entitled to summary judgment on Plaintiff's claim that she was unlawfully seized in violation of the Fourth Amendment*

    a. <u>When the facts are viewed in the light most favorable to Plaintiff, the SRT violated her Fourth Amendment rights</u>

The Fourth Amendment provides: "The right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. Fourth Amendment jurisprudence is, accordingly, governed by a reasonableness standard. *See, e.g., Abney v. Coe,* 493 F.3d 412, 419 (4th Cir. 2007) ("The touchstone of [the Fourth Amendment] inquiry is reasonableness."). A police officer may stop and briefly detain a person for investigative purposes when there is *reasonable* suspicion, based on articulable facts, that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). The officer may use objectively *reasonable* force to effectuate such detention. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Reasonableness is the balancing of competing interests. It is judged based on a totality of circumstances standard, which takes into consideration the information known to the officers at the time in question and any reasonable inferences to be drawn therefrom. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "The 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." *Graham*, 490 U.S. at 395 (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)) (emphasis in original).

In *Michigan v. Summers*, the U.S. Supreme Court addressed the reasonableness of detaining the occupants of a home, when the residence is searched pursuant to a valid warrant. *See generally,*

452 U.S. 692 (1981). *Summers* dealt with the detention of a resident, whom the police encountered descending the steps of a house, as the police were approaching to execute a warrant to search for narcotics. The individual was detained while the officers searched the premises and, after narcotics were found and it was ascertained that the detainee owned the home, he was arrested and searched. *Id*. at 693. The officers found heroin on his person, which the individual moved to suppress as the product of an illegal search. The dispositive question in *Summers* was whether the defendant's initial detention violated his Fourth Amendment rights (i.e., whether the officers had the right to require him to re-enter the home and remain there while they conducted the search). *Id.* at 694. The Court found the officers possessed this authority, holding that "for Fourth Amendment purposes ... a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a search is conducted." *Id.* at 703. Thus, *Summers* held that law enforcement officers may detain the occupants of a residence, during a warrant-based search, as a matter of course. *Id.* at 705; *Muehler v. Mena*, 544 U.S. 93, 98 (2005) ("An officer's authority to detain incidental to a search is categorical[.]").

In reaching this conclusion, the Court reviewed the probable cause requirement for seizures, the general privacy protections afforded by the Fourth Amendment, and the exceptions to the probable cause requirement that had, at that point, been made for certain less intrusive seizures. *Id.* at 699-701. The Court recognized the general rule that every arrest and every seizure that has the essential attributes of a formal arrest must be supported by probable cause. *Id.* at 701. However, the Court concluded that reasonableness, not probable cause, is the "ultimate standard ... embodied in the Fourth Amendment." *Id.* at 699-700. "Therefore, in order to decide whether [a particular] case is controlled by the general rule, [the Court held] it is necessary to examine both

15

the character of the official intrusion and its justification." *Id.* at 700-01.

> With regard to the character of the intrusion, the Court found:

> [T]he type of detention imposed [incident to a warrant] is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention. Moreover, because the detention in this case was in respondent's own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station. *Id.* at 701-02.

With regard to justification, the Court held that "[i]n assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both law enforcement interest and the nature of the 'articulable facts' supporting detention are relevant." *Id.* at 702. The Court then explained that the law enforcement interests served by a warrant-related detention are: (1) "preventing flight in the event that incriminating evidence is found," (2) "minimizing the risk of harm to the officers," and (3) facilitating "the orderly completion of the search." *Id.* at 702-705; *see also Muehler*, 544 U.S. at 98. The Court reasoned that a search-related detention is appropriate because "[t]he risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 702-703. Thus, relying on the above law enforcement interests, and upon a finding that "detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid search warrant," *id.* at 703, the Court held that, taken together, the issuance of a warrant by a neutral magistrate and the connection of an occupant to the premises to be searched justify the detention of occupants during the course of a warrant-based search. *Id.* at 703-05.

> Ms. Hutchinson's detention was a *Summers* detention. The SRT search of Plaintiff's home,

on July 8, 2005, occurred pursuant to a search warrant. Further, Plaintiff does not contest the sufficiency of this warrant or the validity of the initial intrusion. Rather, Plaintiff's challenge concerns the conditions of her detention. Specifically, she claims that her seizure was unlawful because she was forced to remain naked, in plain view of the eight SRT members, her brother, her stepfather and her then-fiancé, for an unreasonable period of time.[7] Therefore, the question raised is whether the law enforcement interests articulated in *Summers* justified the character of the intrusion suffered by Chastity Hutchinson. Did they justify requiring her to remain exposed, for 30 to 45 minutes, in the view of eleven men? To resolve this issue, the Court looks to decisions that have applied the *Summers* test, either at the U.S. Supreme Court, or in cases with similar facts.[8]

First, the Court looks to *Muehler v. Mena*. 544 U.S. 93 (2005). In *Muehler*, the U.S. Supreme Court reviewed the constitutionality of a particular *Summers* detention. The contested detention was the two- to three-hour detention of a five-foot, two-inch woman, who was restrained with handcuffs while detained in a garage, during a warrant-based search of a residence known to house gang members and weapons. *See generally* 544 U.S. 93. Mena, the woman, was detained along with three other persons. They were monitored by two law enforcement officers, in a converted garage. *Id.* Mena filed suit, challenging her detention as a violation of her Fourth

---

[7] Plaintiff asserts her claim under the Fourth Amendment and the W.V. Constitution. The State constitution has been interpreted "in harmony with federal case law construing the Fourth Amendment." *State v. Jones*, 456 S.E.2d 459, 463 n. 6 (W. Va. 1995). Therefore, Plaintiff's illegal seizure claim is reviewed pursuant to the Fourth Amendment.

[8] The *Summers* court did not delve into the limitations of a warrant-based detention. For example, it did not address the reasonable length of such a detention, or what conditions may make a warrant-based detention unconstitutional. *See id.* at 705 n. 21 ("Although special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, we are persuaded that this routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is not such a case."). This task was left to subsequent cases.

Amendment rights.  Specifically, Mena argued it was objectively unreasonable to confine her to the garage and to keep her in handcuffs during the search.  The Ninth Circuit agreed.  It held that the police "should have released Mena as soon as it became clear that she posed no immediate threat."  *Muehler*, 544 U.S. at 97 (characterizing the Ninth Circuit's holding).  The U.S. Supreme Court disagreed, however, and reversed.

Quoting *Summers*, the Court "held that officers executing a search warrant for contraband have the authority 'to detain the occupants of the premises while a proper search is conducted.'" *Id.* at 98 (quoting *Summers*, 452 U.S. at 705)).  "Such detentions are appropriate, [the Court] explained, because the character of the additional intrusion caused by the detention is slight and because the justifications for detention are substantial."  *Id.* at 98; *see also id.* ("Against this incremental intrusion, we posited three legitimate law enforcement interests that provide substantial justification for detaining an occupant: 'preventing flight ...'; 'minimizing the risk of harm to officers'; and facilitating 'the orderly completion of the search[.]'").  In *Muehler*, the Court found the use of handcuffs and the detention of the three other occupants reasonable, because

> this was no ordinary search.  The governmental interests in not only detaining, but using handcuffs, are at their maximum when, as here, a warrant authorizes a search for weapons and a wanted gang member resides on the premises.  In such inherently dangerous situations, the use of handcuffs minimizes the risk of harm to both officers and occupants. *Id.* at 100.

Further, with regard to the duration of the detention, the Court held that, although

> [t]he duration of a detention can, of course, affect the balance of interests under *Graham* ... the 2- to 3-hour detention in handcuffs in this case does not outweigh the government's continuing safety interests. ... [T]his case involved the detention of four detainees by two officers during a search of a gang house for dangerous weapons.  *Id.*

Clearly, the searches in *Summers* and *Muehler* were found reasonable.  However, inherent in each decision is the principle that the circumstances and manner of a warrant-based detention

18

matter.  *See id.* at 98-100; *Summers*, 452 U.S. at 701-05.  Therefore, each decision supports Plaintiff's contention that her particular detention must be scrutinized, based on the length, stigma, specific dangers, restraints, inconvenience, and indignity involved, to determine whether the conditions of the detention were reasonable.  Here, Plaintiff does not contest the overall length of her detention.  *See Muehler*, 544 U.S. 98-100 (a two to three-hour warrant-based detention found reasonable).  Rather, she argues that the length of time she was forced to remain nude was unreasonable.  In light of the cases applying the *Summers* factors to detentions with similar facts, this Court agrees.

To begin with, in 2007, the U.S. Supreme Court decided *Los Angeles County, California v. Rettele*.  550 U.S. 609 (2007).  In *Rettele*, sheriff's department deputies executed a warrant to search a home around 7:15 a.m.  The deputies expected to find three African-Americans suspected of fraud and identity theft, one of whom was known to own a registered handgun. During the search, the deputies entered a bedroom, where they found two Caucasian adults sleeping naked. The deputies ordered the individuals out of the bed and required them to stand, unclothed and at gun point, for approximately two minutes, while the officers checked the bedroom for dangers. Once the room was clear, the naked couple was allowed to dress and brought to the home's living room, to be detained while the remainder of the residence was searched.  The couple's removal to the living room occurred within three to four minutes of the officers' entry into the bedroom. *Rettele,* 550 U.S. at 611-13.  Further, the search team found no evidence of illegal activity and the deputies left the home within 15 minutes of initial entry.  *Id.*

The only persons discovered in the home searched in *Rettele* were three Caucasians. Following the search, these occupants filed suit against the police.  The occupants challenged the

19

search as unconstitutional, arguing it was unreasonable for the deputies to have required the couple to stand naked while their bedroom was cleared for dangers.  *Id.* at 612.  The U.S. Supreme Court disagreed.  In an opinion citing to to *Summers* and *Muehler*, the Court reasoned that:

> When the deputies ordered respondents from their bed, they had no way of knowing whether the African-American suspects were elsewhere in the house.  The presence of some Caucasians in the residence did not eliminate the possibility that the suspects lived there as well. ... [Therefore,] [t]he deputies, who were searching the house where they believed a suspect might be armed, possessed authority to secure the premises before deciding whether to continue with the search.  *Id.* at 613.

With regard to the deputies' specific requirement that the couple stand naked while their bedroom was cleared, the Court held that:

> The orders by the police to the occupants, in the context of this lawful search, were permissible, and perhaps necessary to protect the safety of the deputies.  Blankets and bedding can conceal a weapon, and one of the suspects was known to own a firearm, factors which underscore this point. ... *The deputies needed a moment to secure the room and ensure that other persons were not close by or did not present a danger.  Id.* at 614-15 (emphasis supplied).

In reaching this conclusion, *Rettele* explicitly applied the *Summers*' test, balancing the specific law enforcement interests at stake against the character of the particular intrusion.  With regard to the character of the intrusion, the Court reasoned that the occupants were required to stand naked for no more than two minutes.  "There [was] no accusation that the detention [] was prolonged ... [a]nd there [was] no allegation that the deputies prevented [the detainees] from dressing longer than necessary to protect their safety."  *Id.* at 615.  Rather, a detainee testified that, once the room was cleared, "[the deputies] wanted [them] to get dressed and [] were pressing them really fast to hurry up and get some clothes on."  *Id.*  Consequently, the Court found that the intrusion caused by the couple's brief nakedness was limited.  It then found this limited intrusion justified, in light of the need to minimize the risk of harm to officers and to quickly secure a room upon entry.

20

When her account of events is accepted as true, *Rettele* supports the finding that Chastity Hutchinson's detention was unreasonable. In *Rettele*, the U.S. Supreme Court's conclusion that the detention was reasonable relied upon its finding that the deputies required the couple to remain naked no longer than necessary to secure the bedroom and protect officer safety. *Id.* at 615 (the officers "needed *a* moment to secure *the* room") (emphasis supplied). Moreover, in *Rettele,* the occupants were clothed *before* being removed to the living room, within two minutes of their discovery. The same cannot be said here. Therefore, the same conclusion cannot be reached here.

In this case, officer safety was clearly a legitimate government interest during the July 8, 2005 search. The search was expected to bring officers into contact with individuals known to have violent criminal histories, who were likely to possess firearms. Additionally, officers expected to encounter the dangers associated with the production of methamphetamine. There was also the possibility that occupants may destroy evidence or attempt to flee. TFC. Berry specifically refers to these concerns in his description of the initial clear of the bathroom. He explains: "I moved up [into the bathroom] ... to make sure no one else was in that shower or if she was a decoy for somebody standing there, you know, putting drugs down the – down the drain in the shower. So as I moved up, I made sure there was nobody there and then I checked the toilet ... to see if she had been flushing drugs in the toilet." *Todd Berry Depo.* (Doc. 173-18), at 61.

In light of *Rettele*, TFC. Berry's testimony demonstrates the reasonableness of his decision to require Chastity Hutchinson to remain naked while he cleared the bathroom. The decision was a split-second decision, made in the heat of the initial clear, and in the context of the potential danger of other individuals and/or the destruction of evidence. Additionally, in light of the small size of the bathroom, and taking into consideration TFC. Berry's need to quickly and safely

securing the room, the Court finds it was likely reasonable for the second SRT member to remove Ms. Hutchinson from the bathroom before allowing her to obtain covering. In both cases, the character of the intrusion would be slight or incremental because the related delay in obtaining Ms. Hutchinson clothing was brief (only so long as necessary to clear the bathroom or to remove Plaintiff from the bathroom so that it may be cleared). Therefore, when weighed against the need for TFC. Berry to quickly and safely secure the bathroom, this brief forced nakedness is reasonable.

The problem presented by this case, however, is that – when the facts are viewed in the light most favorable to Plaintiff – Chastity Hutchinson's nude detention was not brief. To the contrary, according to the testimony provided by Plaintiff, by Mike Allen, and by Edward Glenn, Chastity Hutchinson, a young woman, was forced to remain naked, in the presence of eleven men, for 30 to 45 minutes. First Sgt. Stonestreet testified that it takes between four and five minutes to clear a residence the size of Plaintiff's. *Stonestreet Depo.* (Doc.168-5), at 82. Therefore, even if it had been reasonable to remove Chastity Hutchinson from the bathroom naked, the Court finds there was no legitimate law enforcement interest, or other defensible excuse, to justify her prolonged naked detention.[9] Ultimately, the Court finds it was unreasonable to leave her naked any longer than necessary to clear the residence of danger (i.e., any more than a few minutes). Once removed to the living room, Chastity Hutchinson no longer posed a risk of flight, nor was she in a position to destroy evidence. Additionally, once the residence was cleared for dangers, there was no safety-

---

[9]Although the insult and humiliation caused by forced nudity is so obvious it does not require citation, the offensive nature of this degradation has been considered by courts assessing the reasonableness of governmental detentions in the past. *See Monroe v. Pape*, 365 U.S. 167, 210 (1961) (Frankfurter, J., dissenting) (recognizing "the calculated degradation of insult and forced nakedness." ), *overruled on other grounds by Monell v. Dep't of Social Srvcs.*, 436 U.S. 658 (1978); *see generally Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001) (considering the sexual intrusion caused by public exposure, when determining whether a particular search and seizure was unreasonable).

based excuse to justify not clothing or covering Ms. Hutchinson.  This is particularly true in this case, where there were twice as many law enforcement officers than detainees.[10]  Therefore, in summary, the Court concludes that, applying the balancing test used in *Summers*, *Muehler*, and *Rettele*, Plaintiff has obviously established a triable issue of fact concerning whether the intrusion caused by her prolonged naked detention was unconstitutional.[11]

This conclusion is consistent with the holdings of other federal district courts that have addressed cases with similar facts, *see Luster v. Ledbetter*, 647 F.Supp.2d 1303 (M.D. Ala. 2009); *Bancroft v. City of Mount Vernon*, 672 F.Supp.2d 391 (S.D. N.Y. 2009); *Hunt v. Hunter*, 2008 WL 2036701 (E.D. Tex. May 8, 2008), as well as with the Sixth Circuit's decision in *Hall v. Shipley*. 932 F.2d 1147 (6th Cir. 1991).

In *Hall v. Shipley*, a 1991 case, a man was forced to remain naked for a period of time, while police officers searched his residence.  932 F.2d at 1148-49. The length of time the occupant was required to stand nude was disputed.  Viewing the facts in the light most favorable to that plaintiff, however, the Court found it was somewhere between 20 and 30 minutes. *Id.* at 1153.  The

---

[10] The presence of additional officers shows that it would have been fairly easy for an officer to retrieve clothing for Ms. Hutchinson, without compromising the safety of the other officers or occupants.

[11]When Ms. Hutchinson's prolonged nakedness is combined with (1) the demeaning commentary made by some SRT members and (2) the decision of one of the officers to pat or slap her bare behind, it appears Chastity Hutchinson's forced nakedness may have been intended as a form of humiliation and, possibly even, sport.  Such behavior on the part of law enforcement officers, vested with the authority and responsibility to protect the public, would be abhorrent. Thus, even though the Court finds that, standing alone, requiring Ms. Hutchinson to remain naked for 30 to 45 minutes would render the conditions of her detention objectively unreasonable, the Court finds that evidence of demeaning comments and inappropriate touching is relevant, here, because it supports an inference that the officers intended to humiliate her. This further supports the Court's finding that the conditions of Ms. Hutchinson's detention may have been unconstitutional.

23

man filed suit, claiming that this forced nakedness was unreasonable and, accordingly, violated his Fourth Amendment rights. The police then moved for summary judgment on the basis of qualified immunity. *Id.* at 1149. A district court denied summary judgment, on the nakedness issue, and the Sixth Circuit affirmed. In doing so, the Court cited *Monell v. Pape*, 365 U.S. 167 (1961), holding "that a reasonable officer in appellant officers' position would have known that requiring an individual to sit naked [for 20 to 30 minutes] while exposed to the cold January air would violate such individual's 'clearly established' rights." *Id.* at 1154.

In *Bancroft*, an adult woman was discovered in bed, unclothed, when police officers executed a warrant to search her home, at 6 a.m. 672 F.Supp.2d at 395. When she sat up in bed, startled by the police, the woman's breasts were exposed. They remained so, despite the woman's requests to cover herself, for three to four minutes. During that time, the officers secured the room. *Id.* at 397-98. The woman sued, claiming the officers violated her right to privacy by refusing to allow her to more immediately cover her nakedness. *Id.* at 407. The Southern District of New York granted summary judgment for the officers. It held that law enforcement "do[es] not violate privacy rights when, in the course of executing a search warrant, they refuse to allow unclothed persons to cover themselves while they sweep and secure a room." *Id.* at 407-08 (citing *Rettele*, 550 U.S. at 615-16). In finding that plaintiff's brief nakedness constitutional, the Court explained that "[she did] not allege any facts tending to suggest that the officers took longer than necessary to protect their safety ... and they brought her clothes and allowed her to dress before they handcuffed her." *Id.* at 408. Thus, it dismissed the woman's Fourth Amendment claim. *Id.*

Taken together, *Hall* and *Bancroft* support this Court's decision, for they provide: (1) that an occupant may only be kept naked so long as necessary to secure a room or otherwise ensure

24

officer safety, and (2) that prolonged forced nakedness is a violation of clearly established rights.

The Eastern District of Texas's decision in *Hunt* also supports these conclusions. In *Hunt*, the Court addressed a motion for summary judgment on fairly similar facts. During the course of a warrant-based search, a woman was forced to lie on the floor of her home, with her dress raised to her waist, while the premises were cleared for dangers. 2008 WL 2036701, at *10-11. The police moved for summary judgment on the basis of qualified immunity and the Court granted the motion. In doing so, the Court held that:

> [T]he frustration, embarrassment, and humiliation caused by being detained even while nude is generally not enough to establish that officers have acted unreasonably. Rather, an innocent detainee's interest in covering herself where police safety may be at issue is outweighed by the need for officers to take unquestioned command of the situation in order to minimize the risk of harm to both the police and the occupants of the home. Furthermore, there is no evidence that [the officers] prevented Mrs. Hunt from pulling her dress down longer than necessary to protect their safety. In fact, Mrs. Hunt admits that she was subsequently assisted in getting off the ground and was helped to a chair after officers determined that the premises were secure. *Id.* at *11.

Again, the *Hunt* court applied the *Summers'* balancing test. It weighed the law enforcement interest in officer safety against the specific intrusion caused by the occupant's forced nakedness, finding the character of the intrusion not unreasonable, because the officers required Mrs. Hunt to remain nude "no ... longer than necessary to protect officer safety." *Id.* Accordingly, *Hunt* reinforces the principle articulated in *Rettele* and *Bancroft*: that, when it comes to the reasonableness of forced nakedness, time is of the essence. An officer may require a detainee to remain nude no longer than necessary to secure a room, or to otherwise minimize the risk of harm to officers and occupants. The case also supports the general rule that, once secure, police officers should permit a detainee to obtain clothing or other coverage. *Id.*; *see also Rettele,* 550 U.S. at 615; *Bancroft*, 672 F.Supp.2d at 408.

Finally, this Court's conclusion that Chastity Hutchinson's Fourth Amendment rights were violated by her 30- to 45-minute naked detention is supported by the Middle District of Alabama's decision in *Luster*. In *Luster*, a woman was forced to stand nude, outside her home, exposed to the public, while law enforcement executed a search warrant of her residence. 647 F.Supp.2d at 1305-06. Applying *Rettele* and *Hall*, the Court found that the woman's Fourth Amendment right to be protected from unreasonable seizures was violated because "unlike the home occupants in *Rettele*, Mrs. Luster was left exposed for a period of time after the premises had been secured – that is, for a period of time after there was no longer any plausible reason for her to be left exposed." *Id.* at 1309. This holding – that there must be some plausible law enforcement interest in prolonged nudity – is consistent with each of the opinions discussed above. Further, it supports this Court's ultimate finding that, when it comes to providing coverage to naked detainees, time is of the essence. Therefore, *Luster* supports the denial of summary judgment here because, when the facts are viewed in the light most favorable to Plaintiff, it is evident she was required to remain nude significantly longer than necessary to secure the premises or to ensure officer safety, on July 8, 2005. *See Stonestreet Depo.* (Doc. 168-5), at 82 (testifying that it takes 4-5 minutes to secure a home the size of Plaintiff's).

      b.      <u>Qualified immunity</u>

Now that the Court has determined that there was a violation of Plaintiff's constitutional rights, it must ascertain whether the SRT members are entitled to qualified immunity. "Qualified immunity is an accommodation by the courts to the conflicting concerns, on one hand, government officials seeking freedom from personal monetary liability and harassing ligation and, on the other hand, injured persons seeking redress for the abuse of official power." *Amaechi,* 237 F.3d at 360

(quoting *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994)).  "Qualified immunity protects government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Consequently, the qualified immunity inquiry is a two-step process.  First, the Court determines whether the plaintiff alleges a violation of her constitutional rights.  Then, she must show that the right violated was clearly established at the time of the violation.  *Id.*

This Court has determined that there is a triable question concerning whether, during the execution of the search warrant, on July 8, 2005, Plaintiff Chastity Hutchinson's constitutional rights were violated.  The next question the Court must resolve, therefore, is whether this right – the right not to be forced to be nude for 30 to 45 minutes, while police officers conduct a warrant-based search of one's home – was clearly established on July 8, 2005.  The Court finds that it was.[12]

*Rettele* was not decided until May 2007.  Thus, the issue is whether earlier U.S. Supreme Court and Fourth Circuit precedent (pre-July 2005) clearly established Plaintiff's right to be free from the forced nakedness she endured in July 2005.  "[T]he exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established."  *Id.* at 362 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "'[C]learly established' in this context includes not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked."  *Id.* at 362-643 (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992)); *see also Waterman v. Batton,* 393 F.3d 471, 476 (4th Cir. 2005) (same).  "Qualified immunity protects 'all but the plainly incompetent or those who

---

[12]On this point, the Court disagrees with the Middle District of Alabama's decision in *Luster*.  *See* 647 F.Supp.2d at 1310-11 (granting officers qualified immunity).

knowingly violate the law.'" *Waterman*, 393 F.3d at 476 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Therefore, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

To assess the qualified immunity issue,  the Court must determine whether, on July 8, 2005, the contours of Plaintiff's Fourth Amendment right to be free from unreasonable seizures afforded the SRT members notice that a 30- to 45-minute nude detention, after securing the premises, would be unconstitutional (i.e, would cross the Fourth Amendment line). *See Amaechi*, 237 F.3d at 363; *see also Luster*, 647 F.Supp.2d at 1311.  Again, the simple answer is yes.  The U.S. Supreme Court decided *Summers* in 1981.  *Summers* established the balancing test later applied in *Muehler* and, ultimately, in *Rettele.  See* 452 U.S. at 701-03; *see generally Muehler,* 544 U.S. 93; *Rettele,* 550 U.S. 609.    According to *Summers*, reasonableness must be determined by balancing the law enforcement interests in preventing flight, minimizing the risk of harm to officers, and facilitating the orderly completion of a search against the character of the particular intrusion caused by a warrant-based seizure.  452 U.S. at 702-03.  When conducting its balancing test, *Summers* specifically found that the relevant law enforcement interests must be weighed against the "public stigma" and "indignity" imposed by a seizure; ultimately holding that, "[a]lthough special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case, ... [the] routine detention of residents of a house while it was being searched for contraband pursuant to a valid warrant is [reasonable]."  *Summers,* 452 U.S. at 705 n. 21.

The U.S. Supreme Court applied the *Summers* factors in *Muehler*, in March 2005, when it assessed the constitutionality of a two- to three-hour, handcuffed detention of a woman that occurred pursuant to a warrant search.  *See generally Muehler,* 544 U.S. 93.  Therefore, in light of

*Summers* and *Muehler,* it is evident that, by March 2005 at the latest, the balancing test announced in *Summers* was clearly established.

Accordingly, the pertinent question with regard to qualified immunity is whether, on July 8, 2005, the *Summers* test clearly established Plaintiff's right to be free from an unjustified 30- to 45-minute naked detention.  The Court finds that it did.  *Summers* and *Muehler* clearly established that, when executing a warrant-based detention, an officer's conduct will be assessed for reasonableness, with the specific character of the intrusion imposed by an officer weighed against the government's particular need to prevent flight, minimize safety risks, or facilitate the orderly completion of the search.  Inherent in this rule – and in Fourth Amendment jurisprudence generally – is the opposite conclusion: that a detainee's Fourth Amendment rights may not be intruded upon without a justifiable reason (i.e., that in the absence of the need to prevent flight, minimize safety risks, or facilitate the completion of the search a detainee's rights may not be further compromised). *See Amaechi,* 237 F.3d at 366 ("[T]he Fourth Amendment ... at its core is designed to protect privacy and personal dignity against unjustified invasion by the State[.]").  This is (and was in July 2005) particularly true when a detainee's rights are compromised in a sexually intrusive manner.[13]

---

[13]As noted *supra*, the U.S. Supreme Court has long recognized "the calculated degradation of insult and forced nakedness." *Monroe*, 365 U.S. at 210 (Frankfurter, J., dissenting); *see also Amaechi*, 237 F.3d at 364 (recognizing "the fact, first established in *Bell*, that the intrusive, highly degrading nature of a strip search demands a reason for conducting such a search that counterbalances the invasion of personal rights that such a search involves") (referring to *Bell v. Wolfish*, 441 U.S. 520 (1979)).  Moreover, the indignity and intrusiveness of forced or public nakedness is a fact of life that does not require judicial recognition to be clearly understood.  It is the reason for dressing rooms in department stores, window shades in urban bedrooms, and public indecency laws.  Accordingly, in July 2005, it was well-understood that an individual's Fourth Amendment right to be free from unreasonable seizures "manifestly included" the right to be free from the humiliation or insult associated with unjustified forced nakedness.  *See Hall,* 932 F.2d at 1154 (explicitly recognizing this right in the context of a warrant-based search).

To sum up, *Summers* and *Muehler* provided clear notice: (1) that the character and conditions of any warrant-based detention may be scrutinized, and (2) that any intrusion that police officers cannot justify under *Summers* and *Muehler* is unreasonable and unconstitutional. Defendants provide no reasonable explanation for a prolonged naked detention of Chastity Hutchinson on July 8 and 9, 2005. Ms. Hutchinson was one of four detainees, being secured and monitored by eight police officers. She was the only female present among eleven men. Once removed to the living room, she did not present a safety risk to the officers, nor was there a realistic threat that she may attempt to flee or destroy evidence. To the contrary, SRT member testimony provides that Plaintiff's home was secure within four to five minutes of initial entry and that Chastity Hutchinson did not present a specific or immediate threat.[14] Chastity Hutchinson's prolonged naked detention was, therefore, plainly unconstitutional under *Summers* and *Muehler*; a legal fact this Court finds a reasonable officer should have known. Once the residence was secure, it was manifestly unreasonable for the SRT officers to deny Ms. Hutchinson's requests for clothing. This is particularly true in light of the sexually intrusive nature of forced nakedness and the officer to detainee ratio at the time of Ms. Hutchinson's detention. *See generally  Monroe v. Pape*, 365 U.S. 167, 210 (1961); *Bell v. Wolfish*, 441 U.S. 520 (1979); *Summers v. Michigan*, 452 U.S. 692 (1981); *Muehler v. Mena*, 544 U.S. 93 (2005); *Amaechi v. West,* 237 F.3d 356 (4th Cir. 2001); *see also Hall v. Shipley,* 932 F.2d 1147 (6th Cir. 1991). Consequently, if Plaintiff's version

---

[14]*See Todd Berry Depo.* (Doc. 173-18), at 61-62 ("As I moved up, he was right on me and the – she was beyond where I could see in that shower. So as I moved up to get her, I knew she didn't have any weapons because I could see her hands. So my immediate threat was who was standing in that shower so I ... immediately turned my attention to that and he was right behind me and took custody of her."); *see also Arthur Depo.* (Doc. 173-17) at 41 ("**Q:** You cleared the bathroom, but she's wrapped up; right? **A:** Right. **Q:** Did you make her drop her – what was she wrapped in? **A:** No. No. I didn't think she was going to kill him.").

of events is true, the SRT members are not granted qualified immunity and Defendants' motion for summary judgment is **DENIED** insofar as it addresses Plaintiff's unlawful seizure claim (Count II).

II.      *Defendants are entitled to summary judgment on Plaintiff's excessive force claim*

"Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler*, 544 U.S. at 98-99 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In *Graham*, the U.S. Supreme Court held that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." 490 U.S. at 396 (internal quotations omitted). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Therefore, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade by flight." *Graham*, 490 U.S. at 396. Reasonableness is determined under a totality of circumstances standard and "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

When reviewing an excessive force claim, it is the reasonableness of the officers' action at the moment the action is taken that matters. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Id.* (quoting

31

*Johnson v. Glick*, 482 F.2d 1028, 1033 (2nd Cir. 1973)).  Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.  "The question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.

Chastity Hutchinson alleges that the SRT used excessive force in effecting her detention because she was grabbed by her hair and forcibly removed to the living room, with her head shoved downward and her hair used to direct her.  In her complaint, Ms. Hutchinson describes the events as follows: "An officer grabbed her by the hair and slammed her head down into the floor.  Another officer then dragged Ms. Hutchinson, who was bleeding from menstruation, from the bathroom to the living room floor."  *Pl.'s Am. Compl.* (Doc. 41), at ¶¶ 27 & 28.  This account of the events is, plainly, bleak.  However, in deposition, and again in briefing and at oral argument, Plaintiff described a somewhat different scene.  She maintains that she was "dragged" or "drug" to the living room – a description that coincides with the testimony of Mike Allen.  *See Allen Depo.* (Doc. 173-16), at 25.  However, Plaintiff explains that:

> He had me by the hair of the head about right here (indicating) and kind of like slammed my head down for me to get down when he grabbed me by the hair.  And whenever he drug me, I was still like hunkered over trying to cover myself as he pulled me into the living room. ... I was walking.  I was on my feet.  I was just hunkered over, you know.  *Id.* at 134-35.

**Q:     Were you walking?**

A:      Yes, I was walking.  I was on my feet.  I was just hunkered over, you know.

**Q:     So you were kind of hunkered over trying to cover your privates up?**

32

A:     Yes.

**Q:     And he's got you by the hair kind of on top of your head?**

A:     Yes.

**Q:     And he's pulling you along?**

A:     Yes.

**Q:     And you're walking –**

A:     Very fast.

**Q:     – very fast kind of as he pulls you.  Fair?**

A:     Yes.

**Q:     This isn't the situation where you're on the ground and he's actually dragging you by your hair, right?**

A:     No.

**Q:     He's kind of using your hair to guide you?**

A:     Right.

**Q:     Did he pull any of your hair out?**

A:     No.

**Q:     When you say he slammed your head into the ground –**

A:     No, not into the ground, he just kind of, whenever he grabbed me, he was screaming get down.  When he grabbed me, he kind of shoved my head like for me to get further down.   *C. Hutchinson Depo.* (Doc. 168-1), at 135-37.

The U.S. Supreme Court is clear that, even if it may later seem unnecessary, not every push, shove, or other use of force violates the Fourth Amendment.  *See Graham*, 490 at 396.  Rather than be judged after-the-fact, the reasonableness of the force used by an officer must be judged from the perspective of a reasonable officer on the scene.  *Id.*  "The court's focus should be on the

circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliot v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

When Chastity Hutchinson was encountered in the shower, on July 8, 2005, the SRT officers were in the process of securing a home anticipated to contain individuals with violent histories, firearms, and the dangers associated with methamphetamine production. Consequently, Plaintiff's removal from the residence's bathroom occurred under tense, uncertain, and rapidly evolving circumstances, which included substantial potential harm to the removing officers. Upon encountering Plaintiff, TFC. Berry and Cpl. Arthur needed to, first, assess whether she posed a threat to their safety and, next, whether the bathroom contained other immediate dangers. In that context, it was not unreasonable for Cpl. Arthur to forcibly, even roughly, remove Plaintiff from the bathroom. Moreover, in light of the fact that Plaintiff was nude, hunkered over, and reaching to cover her private parts, it was not unreasonable for Cpl. Arthur to secure Plaintiff by grabbing her hair, rather than an arm or other body part. Cpl. Arthur did not drag Plaintiff to the living room, in the sense that he pulled her off her feet by her hair. Rather, Plaintiff explains that she was guided by her hair to the living room, albeit forcefully and fast, walking under her own power. Finally, with respect to Plaintiff's allegations that the officers "slammed her head into the floor," which appear in the Amended Complaint, Plaintiff's deposition testimony describes a less overtly forceful scene. Plaintiff explains that the officers, "shoved my head like for me to get further down," "not into the ground." *C. Hutchinson Depo.* (Doc. 168-1), at 137. In retrospect, the force used by the officers to detain Chastity Hutchinson may have been unnecessary. Nonetheless, such conduct was reasonable under the circumstances and, therefore, fell within the confines of the Fourth

Amendment.[15]  Accordingly, Defendants' motion for summary judgment is **GRANTED** insofar as it addresses Plaintiff's excessive force claim (Count III).

III.    *Defendants are not entitled to summary judgment on Plaintiff's claim that members of the SRT assaulted and battered her during the course of her detention*

Restatement (Second) of Torts § 21 provides: "An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension."  Restatement (Second) of Torts § 21 (1965), *cited with approval in W.Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 495 (W. Va. 2004).  "An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results."    Restatement (Second) of Torts § 18 (1965); *see also Stanley*, 602 S.E.2d 483 at Syl. Pt. 8 ("In order to be liable for battery, an actor must act with the intention of causing a harmful or offensive contact with a person."); *Funeral Services by Gregory, Inc. v. Bluefield Cmty. Hosp.*, Syl. Pt. 1, 413 S.E.2d 79 (W. Va. 1991)*, overruled on other grounds by Courtney v. Courtney*, 437 S.E.2d 436 (1993) (same). Stated simply, assault occurs when one person puts another in reasonable fear or apprehension of an imminent battery and battery is any harmful or offensive contact.

---

[15]*See McCaskill v. Yankalunas,* 245 Fed. App'x 274 (4th Cir. 2007) (unpublished decision).  In *McCaskill*, the Fourth Circuit held that an officer did not use excessive force, when shoving a woman who was 5-months pregnant to the floor, because, "even if she was raising her hands to show her cooperation, she was not complying with the officer's demand" to "get down." *Id.* at *278.  Here, the facts are similar.   *See Todd Berry Depo.* (Doc.173-18), at 61 ("I was advising her to get on the floor.  She was not being physically aggressive, but she was being passively non compliant, would not listen.  At one time I believe she asked for a towel.  We – I was giving her commands to get on the floor, she would not.  She immediately reached for a towel.").

An activity that would otherwise subject a person to liability in tort for assault and battery, however, does not constitute tortious conduct if the actor is privileged to engage in such conduct. *Hinjosa v. City of Terrell, Tex.*, 834 F.2d 1223, 1231 (5th Cir. 1988) (citing Restatement (Second) of Torts § 10 (1965)).  An officer executing a search warrant is privileged to use reasonable force to effectuate the detention of the occupants of the place to be searched.  *See Muehler*, 544 U.S. at 98-99 ("Inherent in *Summers'* authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention.") (citing *Graham* , 490 U.S. at 396). Consequently, a claim for assault and battery made against an officer who detains an individual in the course of a warrant-based search is judged according to Fourth Amendment standards.

Plaintiff's assault and battery claim (Count I) alleges that "Defendants individually and in concert did assault and batter [her] by placing a gun to her head ... grabbing her by the hair and slamming her head against the bathroom floor ... dragging her into the living room ... [and] forcing her head against the living room floor with his foot."  *Pl.'s Am. Compl.* (Doc. 41), at ¶¶ 43-39 (paragraphs incorrectly numbered in the Amended Complaint).  In determining that Plaintiff has failed to establish a genuine issue of material fact with regard to her excessive force claim, the Court found that Defendants did not act unreasonably when initially detaining Plaintiff or when forcibly escorting her to the living room for continued detention.  Accordingly, Defendants' motion for summary judgment is **GRANTED** insofar as any assault and battery claims related to Plaintiff's initial detention are concerned.

However, the Court finds that Plaintiff's assault and battery claim is not limited to the facts surrounding her initial detention and removal to the living room.  To the contrary, the Court looks to the totality of the detention to see whether Plaintiff has established a triable issue with respect

to assault and battery.  In doing so, the Court finds that she has.  Specifically, there is a genuine issue of fact concerning whether an SRT member patted or slapped Plaintiff on her naked butt, while she was detained.  Further, Defendants have presented no evidence that suggests there was a reasonable justification for this offensive contact.  *See Graham*, 471 U.S. at 396 (the reasonableness of the force used is judged according to whether a detainee "poses an immediate threat to the safety of the officers or others, and whether [she] is actively resisting arrest or attempting to evade by flight").  Accordingly, when the facts are viewed in the light most favorable to Plaintiff, Defendants' motion for summary judgment is **DENIED**, because there is a triable issue concerning whether Plaintiff was inappropriately and offensively touched, without justification, in the course of her detention.[16]

IV.   *Defendants are not entitled to summary judgment on Plaintiff's claim that they violated her right to privacy*

Plaintiff raises a tortious claim based on the intrusion of her seclusion.  "Unreasonable intrusion upon another's seclusion occurs when '[o]ne ... intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, ... if the intrusion would be highly offensive to a reasonable person."  *Harbolt v. Steel of W. Va., Inc.*, 640 F.Supp.2d 803, 817 (S.D. W.Va. 2009) (Chambers, J.) (citing Restatement (Second) of Torts § 652B); *see also Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 85 (W. Va. 1984) (citing to Restatement (Second) of Torts § 652B).  Defendants argue that "Plaintiff does not allege a plausible claim for intrusion on her seclusion, because such a claim requires that the intrusion be considered

---

[16]Although not explicitly included in the Amended Complaint, the Court finds that the pat on the butt referred to above has been sufficiently briefed, argued, and discussed in deposition to serve as the basis for Plaintiff's assault and battery claim, without any undue surprise or prejudice to Defendants.

offensive by a reasonable person.  Here, the officers who intruded were acting pursuant to a validly-issued search warrant."  *Defs.' Memo.* (Doc. 169), 26 (quoting *Brudwick v. Minor*, No. 05-cv-00601, 2006 WL 1991755, at *20 (D. Colo. July 13, 2006)) (internal quotations and brackets omitted).  At oral argument, Plaintiff conceded that Defendants' search occurred pursuant to a valid warrant.  Consequently, Plaintiff's privacy claim does not pertain to the initial intrusion *into* her home.  Rather, the claim concerns the embarrassing, unjustified, and highly offensive conditions of her detention; specifically the fact that – if Plaintiff's account of the facts are taken as true – she was forced to remain nude, in plain view of eleven men, for 30 to 45 minutes, without any reasonable justification for such nakedness.  *See Pl.'s Resp. in Opp'n* (Doc. 173), 24 (stating the same).  Such an intrusion would, plainly, be highly offensive to a reasonable person.  *See, e.g.,* note 12, *supra.*  Therefore, when the facts are viewed in the light most favorable to Plaintiff, it is evident Defendants' motion for summary judgment must be **DENIED** insofar as Plaintiff's invasion of privacy claim (Count IV) is concerned.

V.    *Defendants are not entitled to summary judgment on Plaintiff's tort of outrage claim*

In West Virginia, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  Syl. Pt. 4, *Williamson v. Harden*, 585 S.E.2d 369 (W. Va. 2003); *see also* Syl Pt. 6, *Harless v. First Nat'l Bank in Fairmont*, 289 S.E.2d 692 (W. Va. 1982) (same).  The elements of a claim for intentional infliction of emotional distress are:

> (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the

38

plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. Syl. Pt. 3, *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419 (W. Va. 1998).

"In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination." Syl. Pt. 7, *Love v. Georgia-Pac. Corp.*, 550 S.E.2d 51 (W. Va. 2001) (quoting *Travis*, 504 S.E.2d 419 at Syl. Pt. 4).

In opposing Plaintiff's intentional infliction of emotional distress claim, Defendants argue that she fails to meet the "uncommonly high bar" required to send such the claim to the jury. Specifically, Defendants claim that Plaintiff has failed to alleged sufficient facts, even when taken as true, to establish elements (1) and (4) above. Element (1) concerns Defendants' conduct. The necessary showing is that the conduct is "so outrageous in character, and so extreme in degree, as to go *beyond all possible bounds of decency*, and to be regarded as *atrocious* and *utterly intolerable in a civilized society*." *Keyes v. Keyes*, 392 S.E.2d 693, 696 (W. Va. 1990) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)) (emphasis in original). In other words, a plaintiff must alleged conduct that would lead the average member of society to exclaim, "Outrageous!" *See McCammon v. Oldaker,* 516 S.E.2d 38, 46 (1999) (citing *Tanner v. Rite Aid of W.V., Inc.,* 461 S.E.2d 149, 157 (1995)).

Viewing Plaintiff's account of the facts as true, she was forced to lay nude, in plain view of eleven men, for 30 to 45 minutes. Over this period, Plaintiff was subjected to sexual harassment

39

and sexual abuse.  She was referred to as, "Bitch," and made the subject of other derogatory comments, including comments about her body.  Despite her repeated requests to cover herself, Plaintiff was refused clothes or other covering.  Additionally, she was quieted, roughly, when she spoke out, and, at one point, an officer slapped her on her naked behind, calling her, "Sweetie," in a manner she perceived as demeaning.  Clearly, a reasonable jury could find this conduct outrageous, atrocious, utterly intolerable, and substantially certain to cause emotional distress. Further, intent is relevant when considering a tort of outrage, as is any power differential between the plaintiff and the defendant.  *See Travis*, 504 S.E.2d at 426 ("In determining whether a defendant's conduct is 'extreme and outrageous,' a finder of fact may consider whether the extreme and outrageous character of the conduct arose from an abuse by the defendant of a position or relationship to the plaintiff, which gave the defendant actual or apparent authority over the plaintiff or power to affect the plaintiff's interests.") (citing Restatement (Second) of Torts § 46 cmt. e). Throughout the course of Plaintiff's detention, the SRT were in a position of obvious power and authority.  Consequently, and assuming as true the substantial facts presented by Plaintiff to support her claim, Ms. Hutchinson has established a triable issue with regard to element (1) – the outrageousness of Defendants' conduct.

Additionally, Plaintiff has established a trial issue with regard to element (4) – the question of whether the emotional distress Plaintiff suffered was so severe that no reasonable person could be expected to endure it.  In her deposition, Plaintiff described a reoccurring nightmare she experienced, and at times still experiences, following the July 8 and 9, 2005 events.  Plaintiff explained that she quit her job and failed to attend interviews for replacement jobs, after the July events, because she was embarrassed by the experience and because she was left feeling wary of

people and uncomfortable in public.  Plaintiff changed residences after the July 2005 search and seizure; she could not bear to be touched by her then-fiancé; and she did not shower for days after her forced naked detention.  In sum, Plaintiff suffered dearly.  The events of early July 2005 changed her life dramatically.  Taken together, these changes and repercussions provide ample evidence to create a triable issue on element (4).

Finally, West Virginia law does not require that a plaintiff alleging the tort of outrage seek treatment for her distress in order to establish the elements of her claim.  Therefore, and because the Court finds that there is sufficient evidence to create a triable fact with regard to elements (2) and (3), Defendants' motion for summary judgment is **DENIED** insofar as it seeks to extinguish Plaintiff's tort of outrage (Count V).

VI.    *Defendants are entitled to summary judgment on Plaintiff's claim that Defendant Lemmon failed to properly train the relevant SRT members*

Plaintiff brings a failure to train claim against Defendant Lemmon.  A failure to train claim is governed by *City of Canton v. Harris*, 489 U.S. 378 (1989).  Under *Canton*, a plaintiff has the burden of proof and "that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *Id.* at 388.  "In resolving the issue ... the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability ... for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390-91.  Moreover, for liability to attach, the specifically identified deficiency in training must be closely related to the alleged injury.  It must be the actual cause.  *Id.* at 391.

Plaintiff has identified a particular training deficiency: the failure of Col. Lemmon to train

SRT members, who are specifically employed in executing high risk search warrants, on the limits and standards of the Fourth Amendment.  Citing Defendants' expert, Plaintiff argues that it is not uncommon for SRT members to encounter occupants in embarrassing and compromising situations, when executing warrants.  Thus, Plaintiff contends that SRT members must be specifically trained to understand and protect the Fourth Amendment rights of those occupants encountered in embarrassing and compromising situations, including those occupants encountered in a state of nakedness.

By identifying the particular training deficiency she believes is at issue, Plaintiff has completed the first *Canton* step.  However, Plaintiff fails to meet her additional burden.  She has failed to show that any failure to train SRT members, on Fourth Amendment issues, constitutes deliberate indifference on the part of Col. Lemmon or that any failure to train the SRT was the actual cause of Plaintiff's injuries.

Plaintiff argues that "[t]he evidence of record gives rise to a reasonable inference that the Defendant West Virginia State Police and Defendant David L. Lemmon provided SRT members with tactical training and failed to train SRT members as to the manner in which the Fourth Amendment limits their conduct so as to prevent searches and seizures that are unusually harmful to an individual's privacy." *Pl.'s Resp. in Opp'n* (Doc.173 ), at 27.  However, neither a "reasonable inference," nor any other implication, is sufficient to establish: (1) deliberate indifference on the part of Defendant Lemmon, or (2) that any failure to train SRT members was the actual cause of Plaintiff's injuries.[17] *Id.* at 391 ("[P]lainly, adequately trained officers occasionally make mistakes;

---

[17]Although limited, the evidence presented to the Court shows that SRT members are trained in constitutional issues, including the Fourth Amendments issues that arise during search and seizure and in the context of the use of force.  *See Stonestreet Affidavit* (Doc. 174-5), at ¶¶ 6 & 7 ("Once a Trooper becomes a member of the SRT, the SRT generally trains sixteen (16)

the fact that they do says little about the training program or the legal basis for holding the city liable.").  Accordingly, Defendants' motion for summary judgment is **GRANTED** insofar as it seeks to extinguish Plaintiff's failure to train claim (Count VI).

**Conclusion**

For the reasons stated, and as described above, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.  The Court **DIRECTS** the Clerk to send a copy of this written Order and Opinion to counsel of record and any unrepresented parties.

ENTER:        August 5, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

hours a month. ... The 16-hour training sessions which occur almost every month include classroom training on proper uses of force, constitutional issues and search and seizure.") (Captain Stonestreet is the Commander of the Special Operations Division of the West Virginia State Police and has been on the SRT since its inception, approximately fifteen years ago.).

43